Gerald GROSSMAN, d/b/a Commodity Traders Weather Service, The Joint Trading Account of Gerald Grossman and Arthur Blumenfeld—Rosenthal Segregated Account, Arthur Blumenfeld, Milton Taylor, Andrew Weiss, Anne Schlanger, and Frank Baltakis, On Their Own Behalf and on Behalf of All Persons Similarly Situated, Plaintiffs,

v.

CITRUS ASSOCIATES OF the NEW YORK COTTON EXCHANGE, INC., Frank S. Pusateri Associates, Inc., Futures Asset Management, Inc., Frank Pusateri, Freese–Notis Co., First American Discount Corp., William "Bill" Mallers, "John Doe" and "Jane Doe," the last two defendants referring to persons whose identity is currently unknown, Defendants.

No. 87 Civ. 8117 (CSH).

United States District Court, S.D. New York.

Feb. 7, 1989.

Charles J. Hecht, New York City, for plaintiffs.

Mound, Cotton & Wollan, New York City, for Citrus Associates of the New York Cotton Exchange, Inc.; Michael R. Koblenz, Costantino P. Suriano, Mitchell S. Cohen, of counsel.

Kent & Eilen, New York City, for First American Discount Corp. and William Mallers Sr.; Howard S. Eilen, of counsel.

David G. Trachtenberg, New York City, Davis, Hockenberg, Wine, Brown, Koehn & Shors, Des Moines, Iowa, for Freese–Notis Associates, Inc.

Newman Tannenbaum Helpern Syracuse & Hirschtritt, New York City, for Frank S. Pusateri Associates, Inc. and Frank S. Pusateri; Richard A. Miller, Richard S. Murad, of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

This action for alleged violations of the Commodity Exchange Act, 7 U.S.C. §§ 1 *et seq.* (the "Act") is now before the Court on various motions of the defendants. Specifically, defendant Citrus Associates of the New York Cotton Exchange, Inc. ("Citrus Exchange") moves for dismissal pursuant to F.R.Civ.P. 8(a), 9(b) and 12(b)(6); defendants Frank Pusateri ("Pusateri"), Frank S. Pusateri Associates, Inc. ("Associates") and Futures Asset Management, Inc. ("Futures Asset")[1] move for dismissal pursuant to Rules 9(b) and 12(b)(6); defendants William Mallers ("Mallers") and First American Discount Corporation ("First American") move for dismissal pursuant to Rules 12(b)(2), 12(b)(6), 9(b), 12(b)(3) and 28 U.S.C. § 1406; and defendant Freese–Notis Co. ("Freese–Notis") moves for summary judgment pursuant to Rule 56(c).

### Amended Complaint

Plaintiffs' amended complaint[2] alleges two separate claims against the various defendants.

---

1. The notice of motion submitted on behalf of Pusateri and Associates also purports to move on behalf of Futures Asset, but the memorandum of law submitted in support of that motion argues only on behalf of Pusateri and Associates. Given the nature of the motion, one pursuant to Rules 9(b) and 12(b)(6), the memorandum of law, although not specific to Futures Asset, will suffice.

2. Plaintiffs filed an amended complaint as of right pursuant to Rule 15(a), prior to the filing of a responsive pleading by any of the defendants.

Plaintiffs' original complaint mistakenly named the Citrus Associates of the New York Cotton Exchange, a non-existent entity, as a defendant. Moreover, the complaint used, and the amended complaint mistakenly continues to use, the acronym "NYCE" which is the registered trademark for The New York Cotton Exchange ("Cotton Exchange"), to refer to the Exchange defendant. The body of the complaint referred at various points to by-laws and officers of the Cotton Exchange. *See* Memorandum of Law in Support of the Motion to Dismiss of Citrus Exchange at 4.

*First Cause of Action*

Plaintiffs' first cause of action alleges in substance that "[u]pon information and belief, Associates, [Futures Asset], Pusateri, Freese–Notis, First American, Mallers and defendants 'John Doe' and 'Jane Doe,' substantially assisted in the scheme to *defraud and manipulate* the price of FCOJ [Frozen Concentrate Orange Juice] contracts and the commodities underlying such contracts." Amended Complaint at ¶ 95 (emphasis added).

Plaintiffs' purport to bring this claim as a violation of "SECTION 25(a) AND (b) OF THE ACT." *See* Amended Complaint at 27. However, Section 22 of the Act, 7 U.S.C. § 25 ("Section 22") merely creates a private right of action for any alleged violations of the various substantive provisions of the Act. Section 22 does not itself contain any such substantive provisions. Plaintiffs' amended complaint is defective in this regard.

A review of the substantive provisions of the Act reveals that Section 4b, 7 U.S.C. § 6b ("Section 4b"), the general anti-fraud provision, in addition to Section 5a, 7 U.S.C. § 7a ("Section 5a") appear to be those upon which plaintiffs posit their claims.

*Second Cause of Action*

The second cause of action sounds in conspiracy and alleges in sum "[u]pon information and belief, during the period of December 13 through December 17, 1985 and prior thereto, all defendants named herein entered into a conspiracy pursuant to which they intended to *defraud* the class members and improperly manipulate the market prices of FCOJ contracts and/or the commodities underlying such contracts." Amended Complaint at ¶ 103 (emphasis added).[3]

Plaintiffs' amended complaint drops the Cotton Exchange as a defendant and instead names the Citrus Exchange.

3. Plaintiffs have not yet moved for class certification, the parties agreeing that any such application would be made ninety (90) days after a decision on the instant motion.

4. Specifically, the joint account lost approximately $44,992.50 in short positions taken between December 12, 1985 through December 17,

Although plaintiffs do not explicitly state their intention to invoke this court's pendent jurisdiction, that is presumably their jurisdictional theory with regard to the second cause of action.

*Facts*

Plaintiff Gerald Grossman, d/b/a Commodity Traders Weather Service ("Grossman"), was, at all times relevant to this action, a commodity trading advisor "engaged in the business of managing and investing customer funds on a discretionary basis in the commodities markets, particularly the Frozen Concentrate Orange Juice ("FCOJ") contract market listed on the defendant Citrus Associates of the New York Cotton Exchange, Inc. ("NYCE") [sic]." Amended Complaint at ¶ 5.

Grossman brings this suit on his behalf as well as on behalf of five clients: Arthur Blumenfeld ("Blumenfeld"), Milton Taylor ("Taylor"), Andrew Weiss ("Weiss"), Anne Schlanger ("Schlanger") and Frank Baltakis ("Baltakis"). *See* Amended Complaint at ¶¶ 7–11. In addition to investing for Blumenfeld as a client, Grossman entered into an arrangement with Blumenfeld, whereby the two became partners in the joint trading account of Gerald Grossman and Arthur Blumenfeld—Rosenthal Segregated Account ("joint account"); that account is also named as a plaintiff in the captioned action.

In total, the named plaintiffs lost in excess of $176,000 in short positions taken in the FCOJ market by Grossman on behalf of himself and his clients over the period December 12, 1985 through December 17, 1985.[4] In essence, plaintiffs contend that their pecuniary losses were suffered by reason of a conspiracy between the defen-

1985. Amended Complaint at ¶ 6. Grossman himself lost an additional $25,000.00 on behalf of the joint account, as a result of payments made to meet margin calls on December 13, 1985 and December 16, 1985. *Id.*

Blumenfeld lost $34,572.80, Taylor $52,005.90, Weiss $24,363.12, Schlanger $13,417.50 and Baltakis $6,667.12 in short positions, taken by Grossman on their behalf over the same period of time. *Id.* at ¶¶ 7–11.

dants to manipulate the price of FCOJ contracts.

Defendant Associates, whose sole shareholder is Pusateri, was, during the relevant time period, in "the business of evaluating [commodity trading advisor's] services to futures commission merchants ... introducing brokers and account executives, and assisting [commodity trading advisors] in the preparation and distribution of their disclosure documents and other sales material." Amended Complaint at ¶ 14.

At some unspecified time, apparently prior to mid-September 1985, Grossman mailed out advertisements to various people in the commodities business in an effort to "increase the size of the money portfolio which he managed." Id. at ¶ 42. Among the people to whom Grossman mailed such advertisements was Pusateri, who had listed his firm, Associates, in the magazine Futures "as a firm that markets [commodity trading advisors]." Id.

Grossman's mailing resulted in a meeting with Pusateri, which took place on or about September 25, 1985. At that meeting it was decided that Grossman would enter into an agreement with Associates, whereby Associates would introduce clients to Grossman and raise money for him to manage, in exchange for a percentage of Grossman's profits. Id. at ¶ 43. On October 14, 1985, Grossman and Associates entered into a written agreement setting out the specific terms of their arrangement. See id. at ¶ 44.

Pursuant to its agreement with Grossman, Associates introduced a single account to him, namely that of Europe and Overseas Traders, S.A. ("EOT"). Id. at ¶ 45. An account was set up with Balfour, Maclaine, Inc. ("Balfour"), a commodities clearing broker, into which EOT was to deposit cash funds and/or securities to be invested by Grossman in commodity futures contracts, particularly FCOJ contracts. Id. at ¶ 46. Grossman began trading the EOT account during late November 1985.[5] He did so by placing orders directly with Balfour's New York City order desk. Plaintiffs contend that, because there were times when "Balfour refused to give Grossman quotes ... Grossman put in his EOT trades through defendant [Futures Asset] ... [which] would in turn relay Grossman's orders on the EOT account to Balfour." Id. at ¶ 47.

At the start of December 1985, Grossman was long approximately 50 March FCOJ contracts, presumably based on his opinion that the price of FCOJ futures would rise. See id. at ¶ 50. However, his view of the market changed on December 11, 1985, at which time Grossman began liquidating his position.

On December 12, 1985, based on his opinion that there was "no chance that a weekend freeze [would] materialize", Grossman took a "short" position in March FCOJ contracts.[6] On December 13, 1985, Grossman continued to build his short position, and "by the afternoon on Friday, December 13, 1985, Grossman's accounts were short approximately 150 contracts for himself and his customers." Id. at ¶ 55.

On December 13, 1985, Grossman heard talk of a "freeze-scare" from "some brokers". Plaintiffs contend these brokers

---

**5.** The amended complaint actually states that Grossman began trading the EOT account "[i]n or about late November, 1987." Id. at 47 (emphasis added). This is clearly a typographical error and will be treated as such.

**6.** Plaintiffs contend that there are "four major ongoing fundamental statistics which affect the price of FCOJ futures contracts"; they identify those "statistics" as:

(i) the weather and temperatures in Florida, particularly in the months of December, January and February and especially U.S. government computer forecasts, as to whether there will be a winter 'freeze' in Florida;

(ii) the first of the month, FCOJ cold storage stocks in Florida;

(iii) the average price and quantities of Brazilian imported FCOJ; and

(iv) the weekly movement of FCOJ from the processors and distributors to the wholesale grocers, supermarkets, etc.

Amended Complaint at ¶ 31.

Plaintiffs maintain that the "single most important factor affecting the price of FCOJ futures contracts in December is the weather and, more particularly, whether there will be any major winter freeze in Florida, i.e., a low temperature at 24 [degrees] Fahrenheit in the orange producing areas." Id. at ¶ 32.

"knew or should have known [that the freeze scare was] based upon false and misleading weather rumors, since published computer meteorological data by the U.S. government, which Grossman and others in the trade saw, indicated no chance of a damaging weekend freeze." *Id.* at ¶ 56.

On Friday, December 13, 1985, just before the close of trading on the Exchange, Grossman maintains he received a call from Pusateri. Pusateri told Grossman that he had heard talk of a weekend freeze. He "demanded" that Grossman cover 23 of the 46 contracts which Grossman was short on the EOT account.[7] *Id.* at ¶ 57. Grossman acceded to Pusateri's "demands" because "he did not want to lose business which he received and might receive in the future from Pusateri." *Id.*

There was no freeze in Florida over the weekend of December 14, 1985. *Id.* at ¶ 59.

On Monday, December 16, 1985, the March FCOJ futures contract opened up 1.50 points, which move Grossman was "informed" was "allegedly due to talk of a damaging freeze (*i.e.,* temperatures below 24 [degrees] Fahrenheit) which was forecast for the morning of Thursday December 19, 1985 by *several weather firms.*" *Id.* at ¶¶ 60–61 (emphasis added). Based on his own analysis of the available data, Grossman did not believe there would be a freeze on Thursday and thus believed the price of FCOJ contracts to be high. *Id.* at ¶¶ 62–63.

Talk of a Thursday freeze prompted Mallers, president of First American,[8] to call Grossman on Monday, December 16, 1985, and "demand[] enough margin to cover two limit days." *Id.* at ¶ 65. Mallers stated that "even with this additional margin he would take off half of the Joint Accounts' position on the opening on Tuesday if the market opened above Monday's close." *Id.* Grossman also received a call

from Pusateri who stated that if the market opened up Tuesday morning, Grossman was to get out of the remaining shorts held on behalf of EOT. *Id.* at ¶ 66.

On December 17, 1985, Grossman received a call from plaintiff Blumenfeld, who informed Grossman that he had called Freese–Notis, a weather forecasting firm, and had been told that "Freese–Notis' low temperature forecast for Thursday morning, December 17 [sic] for the orange groves was for around 32 [degrees]." *Id.* at ¶ 74. Plaintiffs contend that this figure was "way out of line" with the government data publicly available at that time, which forecast a temperature of 44 degrees Fahrenheit. *Id.* at ¶¶ 74–75. Thus, plaintiffs conclude that "such forecasts were recklessly and fraudulently made without any basis in fact and with the intent to manipulate or aid and abet the manipulation of the FCOJ contract market." *Id.* at ¶ 75.

The market opened up almost 2.0 points on Tuesday, December 17, 1985 and trading during the day was active, with the market making significant both upward and downward moves. *See id.* at ¶¶ 77, 90. As a result of such activity, "some twenty traders rushed over to the orange juice pit from the cotton pit and began trading in the FCOJ futures market." *Id.* at ¶ 87. It is these traders who constitute the John and Jane Doe defendants.

Pusateri telephoned Grossman after the start of trading on December 17, 1985 to find out whether Grossman had gotten out of the remaining contracts held for EOT. When told Grossman had not, Pusateri "directed" him to do so. Grossman did. *Id.* at ¶ 78. Plaintiffs conclude that because Pusateri knew that any trading by Grossman was discretionary, Pusateri must have known that the market was going to go up, or he would not have risked potential liability to EOT, which might have arisen had he

---

**7.** Plaintiffs characterize Pusateri's "directions" as a demand, although Grossman was admittedly under no obligation to liquidate his position. The agreement between Grossman and Associates characterized trades made by Grossman on behalf of EOT as discretionary; Associates and Pusateri had no real power to direct Grossman's

trading position. *See* Amended Complaint at ¶¶ 45, 48, 51, 57, 79.

**8.** First American is a registered futures commission merchant with whom Blumenfeld and Grossman maintained the joint account.

prevented EOT from realizing profits on its shorts. *Id.* at ¶ 79.

Furthermore, on December 17, 1985, as Mallers had said it would do, First American liquidated half of the contracts held on behalf of the Joint Account. *Id.* at ¶ 81. Plaintiffs conclude that Mallers must have known that the market was going to go up on Tuesday, or the position of the Joint Account would not have been liquidated. *Id.* at ¶ 81.

During the week of December 16 through December 20, 1985, the temperature in the Florida orange belt never dropped below 40 degrees Fahrenheit. *Id.* at ¶ 92. There was no freeze on December 19, 1985.

As a result of the upward moves in the market over the course of the days prior to December 17, 1985 and during the course of that day, plaintiffs lost money on short positions held in FCOJ futures contracts. In essence, plaintiffs contend that such losses were the result of a scheme by and between the defendants to artificially inflate the price of such contracts through the various acts detailed *supra.*

After these factual allegations, plaintiffs plead their first cause of action in ¶¶ 93–101 of the amended complaint. All defendants are charged with engaging in a scheme to defraud and manipulate the prices of FCOJ futures contracts and the underlying commodities upward to artificially high levels. *Id.* at ¶ 94. ¶ 95 contains specific allegations of fraud inspired acts by all defendants except for the Citrus Exchange. These acts include Pusateri's demand that Grossman immediately get out of the short contracts; the acts of Freese–Notis, First American and Mallers in improperly giving and disseminating false and erroneous information regarding the weather forecast for Florida for December 13–17, 1985; the acts of Mallers and First American in arbitrarily liquidating 14 of 28 positions of the joint account when there was sufficient equity in the account to cover the required margin, and despite the fact that Mallers and First American "know or should have known that there was no chance of a freeze on

Thursday morning"; and the acts of the "John Doe" and "Jane Doe" defendants in buying FCOJ contracts "solely on being informed that the market would be manipulated upwards as aforesaid." *Id.* at ¶ 95(i)–(iv).

The acts and omissions of the Citrus Exchange of which plaintiffs complain are set forth in ¶¶ 96–101. They require some additional analysis.

¶ 96 of the amended complaint alleges as follows:

> [t]he NYCE defendants [sic] manipulated the price of the FCOJ contract market and/or the price of the commodities underlying such contract and wilfully aided, abetted, counseled, induced, and procured the commission of a violation of Section 25 of the Act [sic] by wilfully (i) failing and refusing to take "emergency action" as required by Section 35 of the NYCE [sic] by-laws, (ii) failing and refusing to exercise their discretion to close or suspend trading on the exchange in violation of Section 35 of the NYCE [sic] by-laws and (iii) engaging in a manipulation of the price and/or cornering of the FCOJ and/or the price of the commodities underlying such contracts in violation of Rule 93 of the NYCE [sic], which prohibits such manipulation and/or cornering.

¶ 97 alleges that in a letter dated March 14, 1986, Grossman's attorney requested that the Citrus Exchange "conduct an investigation" into the alleged manipulation of the FCOJ market during December 13–17, 1985. ¶ 98 alleges that on or about April 4, 1986, Grossman himself spoke to James W. Morrissey, chief inspector of the Exchange. Plaintiff's allege that after Grossman had discussed with Morissey the substance of the allegations contained in paragraphs 31 through 93 (which detailed the alleged wrongdoing of the other defendants), Morrissey told Grossman that:

(i) the weather forecasts for Florida for December 13–17, 1985 were uncertain;

(ii) most traders in the FCOJ market did not know the weather forecasts at the opening of trading on December 27;

(iii) the NYCE did not know of the 7.00 point move down on December 17, 1985—the most violent price move on the most violent day in the recent history of the FCOJ market and, hence, did not investigate such movement; and

(iv) after stating that the NYCE did not know of the 7.00 point movement (which occurred at 12:37 p.m. on December 17), Morrissey later stated that the FCOJ market took until *12:37 p.m.* on December 17, 1985 to digest the weather forecasts for December 19, a forecast which was most certainly known by the traders prior to the opening of trading on December 17.

¶ 99 of the amended complaint expresses plaintiffs' dissatisfaction with these responses by Morrissey. Plaintiffs allege that "it is incredible for Morrissey to claim that the [Citrus Exchange] did not even know about the 7.00 down move on December 17, 1985—the largest single movement in the history of the FCOJ contract market." Plaintiffs then point to Morrissey's statement that the market took "until 12:37 p.m. on December 17, 1985 to digest the weather forecasts for December 19." Plaintiffs say this was the "exact time" of the down move, and ask rhetorically: "Had Morrissey and the [Citrus Exchange] in good faith lacked knowledge as to the down move, how could he [Morrissey] possibly in his conversation with Grossman later refer to the *exact time* of the down move?" The last sentence of ¶ 99 alleges:

Such statements, at a minimum, indicate a gross lack of good faith on the part of the NYCE [sic] and Morrisey and lead to the unmistakable inference that the NYCE defendants [sic] were manipulating and/or were aiding and abetting in the manipulation of the price of the FCOJ contract market during the period of December 13–17, 1985.

Plaintiffs conclude their specific allegations concerning the Citrus Exchange in ¶¶ 100 and 101 which read:

100. The dominant and decisive motivation of the NYCE defendants [sic] in not enforcing the aforementioned sections of the NYCE rules [sic] and and [sic] the statements of Morrisey [sic] in the ordinary course of the NYCE's [sic] business was to advance the NYCE defendants' individual and/or corporate self-interest, and/or to derive direct personal gain, rather than to advance the public interest, all of which was done in bad faith.

101. By engaging in the aforementioned acts, the NYCE defendants [sic] acted inconsistent with, contrary to and in violation of their duty and responsibility to advance the public interest and to act with the utmost objectivity, impartiality, honesty and good faith.

### I. *Motions to Dismiss*

Defendants Citrus Exchange, Pusateri, Associates, Futures Asset, Mallers and First American all move for dismissal of the amended complaint.[9]

#### A. *First Cause of Action*
##### 1. *Citrus Exchange*

■ Insofar as plaintiffs' first cause of action alleges that defendant Citrus Exchange "willfully aided, abetted, counseled, induced, and procured" the commission of a violation of the Act, *See id.,* at ¶ 96, it is dismissed with prejudice pursuant to Rule 12(b)(6), for failure to state a claim. Section 22(a)(1) provides a private right of action for aiding and abetting; but that subsection expressly excludes "contract markets and similar organizations" such as the Citrus Exchange, whose liability is defined by subsection (b). *Sam Wong &*

---

**9.** I note that in responding to the summary judgment motion of Freese–Notis, the plaintiffs put in affidavits which might be construed as going to the motions to dismiss of the other defendants. Because these defendants move for dismissal based on the alleged legal insufficiency of the amended complaint itself, I will not consider such affidavits as to those motions.

The pleading must stand or fall on its own terms.

Of course, to the extent plaintiffs' affidavits respond to the motion of Mallers and First American to dismiss for lack of personal jurisdiction and improper venue, they are properly considered.

*Son, Inc. v. New York Mercantile Exch.,* 735 F.2d 653, 665 (2d Cir.1984).

■ As to the remaining elements of plaintiff's first cause of action, the issue is whether these pleadings state a claim against the Citrus Exchange upon which relief can be granted, within the purport of Rule 12(b)(6). All well-pleaded factual allegations are assumed true and are viewed in the light most favorable to the plaintiffs, *Papasan v. Allain,* 478 U.S. 265, 106 S.Ct. 2932, 2943, 92 L.Ed.2d 209 (1986); and a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that plaintiffs can prove no set of facts in support of their claim which would entitle them to relief. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

Conversely, allegations which are not "well-pleaded" are not accepted as true for Rule 12(b)(6) purposes. A complaint "can be so poorly composed as to be functionally illegible"; or allegations, "although grammatically intact, may be so baldly conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains." *Duncan v. AT & T Communications, Inc.,* 668 F.Supp. 232, 234 (S.D.N.Y.1987) (dismissing complaint under Rule 12(b)(6)). The Second Circuit has said recently in the civil rights context that complaints "are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shocks but have no meaning." *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987), *cited in Duncan, supra.* The same pleading criteria apply to the serious charge that an exchange joined with others in a scheme to defraud the very market entrusted to its care.

Thus the conclusory allegations in ¶¶ 93 and 96(iii) that the Exchange participated in a fraudulent scheme do not preserve the pleading against Rule 12(b)(6) challenge. Nor do the equally conclusory allegations of bad faith in ¶¶ 100 and 101. To be sure, bad faith is the standard applicable to an exchanges's acts, *Sam Wong & Son, Inc., supra,* at 666; and these general aver-

ments of condition of mind pass muster under Rule 9(b). *Bishop v. Commodity Exch., Inc.,* 581 F.Supp. 1278, 1279 (S.D.N.Y.1984). But the Rule 12(b)(6) sufficiency of the amended complaint still turns on its particular allegations of wrongdoing.

The gravamen of plaintiffs' charge against the Citrus Exchange is that it failed to take "emergency action" as required by its rules, and failed to close or suspend trading on the exchange as required by its by-laws, during the period December 13–17, 1985, when the market movements cost plaintiffs money. Although plaintiffs find evidentiary support in them, the April 1986 conversations with Morrissey add nothing to the claim of wrongdoing by the exchange, which is limited to acts of omission five months earlier.

In *Sam Wong & Son, Inc., supra,* Judge Friendly said of Section 22(b) of the Act:

Broadly speaking subsection (b) imposes liability for actual losses resulting from failure to enforce any bylaw, rule, regulation, or resolution required to be enforced by § 5a(8) or (9) of the CEA or by the CFTC, or from enforcement of any by-law, rule, regulation or resolution in a manner violating the CEA or any CFTC rule, regulation or order.

735 F.2d at 665–66. As previously noted, to be actionable an exchange's failure to act must be motivated by bad faith.

■ The amended complaint at bar does not state a claim against the Citrus Exchange under Rule 12(b)(6). While the complaint claims a scheme to defraud involving other individuals and entities, there is no allegation that the exchange or any of its members (who are not named as defendants) knew of that scheme, which itself is alleged in only the most conclusory terms. The Second Circuit dismissed a comparable complaint in *Wong, supra,* at 671:

For reasons stated at length by the district court, 571 F.Supp. [1530] at 1541, Wong's allegations concerning the NYME's failure to act with respect to what Wong considers to have been a developing crisis concerning the March, April and May contracts do not measure up to the requirements of the bad faith standard.

Although the complaint claims the existence of the conspiracy of unnamed corporations and individuals to increase prices in the potato futures market through manipulation, it does not allege that the defendants knew this, let alone that their failure to act was based on ulterior motives.

While plaintiffs at bar, unlike those in *Wong*, sufficiently allege the Citrus Exchange's failure to act was based on ulterior motives, there is a total failure to connect, by sufficient allegations, the exchange or any member by knowledge or design with any alleged scheme.

■ Therefore, I grant the Citrus Exchange's motion to dismiss the complaint against it under Rule 12(b)(6). It is a close question as to whether leave to replead should be granted. As presently pleaded by plaintiffs, the exchange's primary stated reason for not suspending trading or conducting a post-trading investigation was the uncertainty of the weather forecasts during the pertinent period, and the time traders needed to digest the forecasts as they evolved. The uncertainty of the forecasts appears from plaintiffs' own earlier allegations; and to charge the exchange for failing in these circumstances to take emergency action or suspend trading stretches even hindsight to its outer limits. Bad faith is not and cannot be made of such stuff. *Wong, supra,* at 671 (denying leave to replead). However, the complaint is inartfully drawn; and, in fairness to plaintiffs, I will permit a repleading, consistent with this opinion. In this and in all repleadings permitted by this opinion, plaintiffs and counsel must keep in mind the 1983 amendments to Rule 11, Fed.R. Civ.P.

## 2. *Pusateri and Associates*

■ As to defendants Pusateri and Associates, plaintiffs bring suit pursuant to Section 22(a), which grants a private right of action against certain non-exchange defendants for violations of substantive provisions of the Act. As discussed in text *supra,* plaintiffs appear to allege that defendants have violated the Act's anti-fraud provision, Section 4b.

Section 22(a) lays out what are in essence certain "conditions precedent" to the maintenance of a suit pursuant to that section; a private right of action will not lie unless such conditions are met.[10] Defendants Pusateri and Associates argue that in failing to plead these "conditions precedent", plaintiffs' amended complaint fails to state a claim against them and is therefore subject to dismissal pursuant to Rule 12(b)(6). I agree.

Nowhere is it alleged in the amended complaint that plaintiffs received trading advice from defendants Pusateri or Associates, or that these defendants were paid a fee for any such advice, a showing which is required to establish liability under Section 22(a)(1)(A). It is also not alleged in the amended complaint that Pusateri or Associates was the entity, individual or corporate, through whom plaintiffs bought and sold FCOJ contracts. Such a showing is a prerequisite to liability under Section

---

**10.** Section 22(a)(1) provides that

[a]ny person ... who violates this chapter or who willfully aids, abets, counsels, induces, or procures the commission of a violation of this chapter shall be liable for actual damages resulting from one or more of the transactions referred to in clauses (A) through (D) of this paragraph and caused by such violation to any other person—

(A) who received trading advice from such person for a fee;

(B) who made through such person any contract of sale of any commodity); or who deposited with or paid to such person money, securities, or property (or incurred debt in lieu thereof) in connection with any order to make such contract;

(C) who purchased from or sold to such person or placed through such person an order for the purchase or sale of—

(i) an option subject to section 6c of this title (other than an option purchased or sold on a contract market or other board of trade);

(ii) a contract subject to section 23 of this title; or

(iii) an interest or participation in a commodity pool; or

(D) who purchased or sold a contract referred to in clause (B) hereof if the violation constitutes a manipulation of the price of any such contract or the price of the commodity underlying such contract.

22(a)(1)(B). Section 22(a)(1)(C), which authorizes a private right of action for violations of the Act concerning the purchase or sale of option contracts, leverage contracts or commodity pool interests, is not applicable to this action. None of those instruments are at issue here.

■ Plaintiffs' amended complaint thus fails to allege the conditions precedent to a private right of action under Section 22(a)(1)(A)–(C). I express no current view as to the sufficiency of plaintiffs' allegations pursuant to Rule 9(b), except to note that the substantive provision which plaintiffs contend was violated, namely Section 4b—the anti-fraud provision of the Act, is clearly subject to the particularity requirement of Rule 9(b). *Gonzalez v. Paine, Webber, Jackson & Curtis, Inc.,* [1982–84 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,615 (S.D.N.Y. November 4, 1982) [1982 WL 1348].

■ Although plaintiffs' amended complaint does not state a claim arising under Section 22(a)(1)(A)–(C), the manipulation provision, Section 22(a)(1)(D), remains to be examined. In order to survive a motion to dismiss, plaintiffs' amended complaint must, at a minimum, assert the elements of the violations alleged. As to a claim of price manipulation, those elements can be found in the case of *In the Matter of Cox, et al.,* [1986–87 Transfer Binder] Comm. Fut.L.Rep. (CCH) ¶ 23,786 at 34,060–61 (July 15, 1987).[11]

> The essential elements of the offense of unlawful price manipulation have been described in a series of federal appellate court decisions, reviewing administrative

determinations by the Secretary of Agriculture. In addition, this Commission has once adjudicated a charge of attempted price manipulation and once adjudicated a claim of completed price manipulation. To sustain the charge of completed manipulation under this precedent, the Division of Enforcement must establish each of several factors by a preponderance of the evidence:

> (1) that the accused had the ability to influence market prices;

> (2) that they specifically intended to do so;

> (3) that artificial prices existed; and

> (4) that the accused caused the artificial prices.[12]

Plaintiffs need not establish the elements of price manipulation by a preponderance of the evidence in this context, but must sufficiently allege each element to survive the instant 12(b)(6) motion.

I am satisfied as to the sufficiency of plaintiffs' allegations with regard to the second and third elements of price manipulation, namely that of intent to manipulate and the existence of artificial prices.[13] However, plaintiffs fail to satisfy their pleading obligations with regard to the first and fourth elements of price manipulation, namely that these defendants had the ability to manipulate the market prices and that their actions caused the allegedly artificial prices. Therefore, plaintiffs' first cause of action is dismissed pursuant to Rule 12(b)(6) as to defendants Pusateri and Associates.

---

**11.** *In the Matter of Cox* did not specifically address the question of a private right of action, but the elements of price manipulation remain the same regardless of who brings suit.

**12.** *Citing See General Foods Corp. v. Brannan,* 170 F.2d 220 (7th Cir.1948); *Great Western Food Distributors, Inc. v. Brannan,* 201 F.2d 476 (7th Cir.), *cert. denied,* 345 U.S. 997, 73 S.Ct. 1140, 97 L.Ed. 1404 (1953); *G.H. Miller & Co. v. United States,* 260 F.2d 286 (7th Cir.1958), *cert. denied,* 359 U.S. 907, 79 S.Ct. 582, 3 L.Ed.2d 572 (1959); *Volkart Brothers, Inc. v. Freeman,* 311 F.2d 52 (5th Cir.1962); *Cargill, Inc. v. Hardin,* 452 F.2d 1154 (8th Cir.1971), *cert. denied,* 406 U.S. 932, 92 S.Ct. 1770, 32 L.Ed.2d 135 (1972); *In re*

*Hohenberg Brothers,* [1975–1977 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 20,271 (Feb. 18, 1977) (attempted manipulation); *In re Indiana Farm Bureau Cooperative Assn., Inc.,* [1982–1984 Transfer Binder] Comm.Fut.L.Rep. (CCH) ¶ 21,796 (Dec. 17, 1982) (manipulation). *See also* II Johnson, *Commodities Regulation,* §§ 5.00–5.35 (1982) and I Russo, *Regulation of Commodities Futures and Options Markets,* §§ 12.01–12.29 (1985 ed.).

**13.** As discussed *supra,* intent can be averred generally under Rule 9(b) and plaintiffs include substantial "evidence" as to their allegations of artificial prices.

### 3. *Futures Asset*

■ As to defendant Futures Asset, the first cause of action is dismissed pursuant to Rule 9(b), for failure to plead fraud with particularity, or, in the alternative pursuant to Rule 12(b)(6), for failure to state a claim. The amended complaint simply says nothing about Futures Asset, except in the most general of terms in those "kitchen sink" portions of the pleading where everyone is alleged to have done everything in violation of the Act.

### 4. *Mallers and First American*

■ Mallers and First American move for dismissal pursuant to Rule 12(b)(2), on the grounds that personal jurisdiction does not lie as to them. They further move for dismissal pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406, on the grounds of improper venue. Lastly, defendants Mallers and First American move for dismissal pursuant to Rules 12(b)(6) and 9(b).

As noted in the factual discussion *supra,* defendant First American is a registered futures commission merchant organized under the laws of Illinois with its principal, if not only place of business in Chicago, Illinois. Affidavit of William Mallers, Sr. at ¶ 2. Mallers is the president of First American, the corporation with whom Blumenfeld and Grossman maintained the joint account.

In conjunction with the opening of the joint account, Blumenfeld signed a "Commodity Customer Agreement" ("Customer Agreement"), which provides in relevant part as follows:

*Construction and Controversies.* This agreement has been made and delivered at Chicago, Illinois. Its validity, construction and enforcement shall be governed by the laws of the State of Illinois, and the undersigned hereby consents and submits to the jurisdiction of the courts of such State.... This agreement shall be binding on the undersigned [Blumenfeld] and/or the estates, executors, administrators, and assignees of the under-

signed. Except to the extent that the Arbitration Agreement is executed by the parties, adjudication or enforcement of controversies which may arise between you [First American] and the undersigned shall be determined *exclusively by the courts of Illinois sitting in the City of Chicago,* and the undersigned *... hereby submits to the exclusive jurisdiction of such courts, and expressly waives the right to the adjudication or enforcement of such controversies by any court or any other tribunal sitting in any other jurisdiction.*

Customer Agreement at ¶ 16 (emphasis added). The Customer Agreement clearly states that all controversies between Blumenfeld and First American are to be litigated in the courts of Chicago, Illinois. Because the action against First American necessarily subsumes that against Mallers who for these purposes are one and the same, the venue issue is identical.

Forum selection clauses are presumptively valid unless their enforcement would deny a litigant his day in court. *M/S Bremen v. Zapata Off–Shore Co.,* 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972). That is not the case here. Enforcement of the forum selection clause of the Customer Agreement is in no way oppressive, unconscionable or against public policy, those factors weighing against enforcement. *See, e.g., Diatronics, Inc. v. Elbit Computers, Ltd.,* 649 F.Supp. 122 (S.D.N.Y.1986), *aff'd,* 812 F.2d 712 (2d Cir.1987); *Leasing Serv. Corp. v. Graham,* 646 F.Supp. 1410 (S.D.N.Y.1986). The forum selection clause of the Customer Agreement is valid.

Although Grossman is not a signatory to the Customer Agreement, the Amended Complaint constantly refers to the account maintained with First American as a "joint account", suggesting that Grossman has some interest in the account, akin to that of an assignee under the Customer Agreement.[14] Therefore, Grossman is also subject to its strictures and must bring his suit in the Chicago courts. As to the other

---

14. Grossman and Blumenthal did enter into an agreement whereby Grossman was given limited power of attorney to act as an "authorized agent" with power of attorney as to Blumenfeld's trading ventures.

representatives or members of the putative class, although it is true that they are not signatories to the "Joint Accounts' customer's agreement", Plaintiffs' Memorandum of Law at 42, the amended complaint contains no allegation of any independent relationship with Mallers or First American.

Therefore, the motion of Mallers and First American to dismiss plaintiffs' amended complaint for improper venue, pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406, is granted.[15]

### 5. "John Doe" and "Jane Doe"

■ It is unclear whether plaintiffs intend to include the unnamed defendants in the first cause of action and if so, under what legal theory. Therefore, as to the "Doe" defendants, the first cause of action is dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

### B. Second Cause of Action

The second cause of action alleges that the various defendants conspired to defraud plaintiffs, fraud being a violation of the Act.

■ Insofar as the second cause of action as to the Citrus Exchange is merely a restating of the first, namely an aiding and abetting claim, it is dismissed with prejudice for the reasons stated in text *supra.*

Inasmuch as plaintiffs assert a bonafide conspiracy claim, it fails for want of any allegation of an agreement between the defendants, an essential element of any conspiracy. *See, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 669 F.Supp. 1244, 1259 (S.D.N.Y.1987); *Minpeco, S.A. v. Conticommodity Servs.,* 552 F.Supp. 327, 331–32 (S.D.N.Y.1982); *Grosser v. Commodity Exch., Inc.,* 639 F.Supp. 1293, 1309–11, 1316–17 (S.D.N.Y.1986), *aff'd,* 859 F.2d 148 (2d Cir.1988). The second cause of action is dismissed pursuant to Rule 12(b)(6), for failure to state a claim.[16]

### II. Summary Judgment Motion

### A. Factual Background

■ Consideration of Freese–Notis' summary judgment motion requires an expanded factual background.

Freese–Notis is an Iowa corporation with its principal place of business in Des Moines, Iowa. Affidavit of Harvey Freese at ¶ 1 ("Freese Affidavit"). Freese–Notis is a private weather forecasting firm in the business of issuing weather reports to its customers for a fee. *Id.* at ¶ 2. Many of Freese–Notis' customers are involved in businesses affected by the weather. *Id.*

Freese–Notis prepares its "commodities-related weather forecasts for various geographic areas" from approximately 5:30 to 7:00 a.m. Central Standard Time ("C.S.T."). *Id.* at ¶ 4. These forecasts are delivered to its customers between 7:00 a.m. and 8:30 a.m. C.S.T., which is prior to the opening of the commodities markets. *Id.* at ¶ 4.

It is common ground that in preparing its forecasts, Freese–Notis, like other weather forecasting firms, uses the meteorological data issued by the National Meteorological Center. Freese–Notis does not simply reissue such data under its own name, but rather considers it as input along with any other available relevant data, using their own "education, experience and skills developed over the years as meteorologists" to produce a forecast ultimately released to its customers. *Id.* at ¶ 5.

The publicly available data issued by the government includes what is known as the LFM computer guidance model. This model gives atmospheric flow patterns at twelve-hour intervals. *Id.* Also included in the government issued weather report is what is known as the "Klein temperatures," which include a set of computer-produced temperatures, including the high and low temperatures expected for each major weather station at twelve-hour inter-

---

**15.** I express no present view as to the remaining grounds for dismissal raised by defendants Mallers and First American.

**16.** Indeed, not only does plaintiffs' amended complaint fail to allege an agreement between the various defendants, it goes so far as to allege the very existence of a conspiracy "on information and belief." Amended complaint at ¶ 103.

vals for the sixty hour period following the time of data collection. *Id.* at ¶ 7.

During December 1985, Freese–Notis received the government weather data, including the Klein temperatures, between 10:00 and 11:00 a.m. C.S.T. and again between 10:00 and 11:00 p.m. C.S.T. daily. *Id.* at ¶ 10.

The parties disagree as to the accuracy of the Klein temperatures, but it suffices that the Klein temperatures have been wrong in the past and it is common ground that private weather forecasters are not in the business of reissuing publicly available data.

### B. *Discussion*

Recent cases decided both by the Supreme Court and the Second Circuit have clarified the standards for deciding summary judgment motions. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986), the Court observed "that at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." The question on a motion for summary judgment is whether there is a "need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. at 2511.

In ascertaining whether there is a "need for a trial," a district judge should resolve all *reasonable doubts* in favor of the party resisting summary judgment. *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 41 (2d Cir.1986), *cert. denied,* 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987).

Of course 'mere conjecture or speculation by the party resisting summary judgment does not provide a basis upon which to deny the motion,' *Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985), and a party 'must do more

than simply show that there is some metaphysical doubt as to the material facts.' *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* [475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538] (1986). *Id.* at 42.

The *Matsushita* Court was clear in its observation that the question of whether a "genuine issue for trial" exists is determined not in a factual vacuum, but in the context of the record as a whole. 475 U.S. at 587, 106 S.Ct. at 1356. Indeed, the Court went on to state "that if the factual context renders respondents' claim *implausible*—if the claim is one that simply makes no economic sense—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Id.* (emphasis added).

This is a situation where plaintiffs' claims simply make no economic sense. Freese–Notis is in the business of providing weather forecasts, mainly to customers themselves in weather sensitive businesses. Certainly it is true that Freese–Notis' "customers want the most accurate forecasts possible ... inaccurate forecasts would lead to customer dissatisfaction and loss of customers, to the detriment of Freese–Notis." Freese Affidavit at ¶ 6. Freese–Notis is in the business of weather forecasting to make a profit, something it presumably could not do if its forecasts were inaccurate. It is contrary to Freese–Notis' economic and long-term business interests to intentionally issue false and misleading weather forecasts.[17]

Freese–Notis does not bear the burden of "proving that [plaintiffs'] case is wholly frivolous", rather its burden will be satisfied if "[it] can point to an absence of evidence to support an essential element of [plaintiffs'] claim". *Brady v. Town of Colchester,* 863 F.2d 205, 210 (2d Cir.1988). Moreover, for reasons discussed *supra,* plaintiffs in this situation bear a heavier than usual burden of persuasion in defeating Freese–Notis' motion for summary

---

**17.** Nowhere does the amended complaint advance any pecuniary or other interest on the part of Freese–Notis as an entity or any of its officers or employees that might have been furthered by the alleged conspiracy.

judgment because of the economic implausibility of the allegations. *See Matsushita,* 475 U.S. at 587, 106 S.Ct. at 1356.

At the time Grossman heard talk of a freeze over the December 13, 1985 weekend, Amended Complaint at ¶ 56, Freese–Notis was predicting mild temperatures for the orange belt. Freese Affidavit at ¶ 12. As Freese–Notis forecasted, there was no freeze over the December 13, 1985 weekend, yet the market was extremely volatile during the business days previous.

On Monday, December 16, 1985, Freese–Notis issued a weather forecast to its customers [18] indicating their opinion that a "damaging freeze was quite possible" on Thursday, December 19, 1985. Plaintiffs themselves admit that *several weather firms* were predicting a Thursday freeze. Amended Complaint at ¶ 61. Again prices rose, but they had risen when Freese–Notis was predicting mild temperatures.

On the morning of Tuesday, December 17, 1985, which was by plaintiffs' own admissions "the first time the market was within a short enough time range for which the Klein temperature forecast for Thursday morning, December 19 was available", *id.* at ¶ 67, Freese–Notis issued a new forecast. The December 17th forecast predicted mild temperatures for Thursday. Freese Affidavit at ¶ 15 and Exhibit 11 Attached Thereto. The December 17th forecast indicated that colder temperatures might move in over the weekend, but stated that the situation was not as clear-cut as it had earlier appeared and further monitoring of the situation was warranted. Plaintiffs seem to be under the misapprehension that a second forecast was issued later that day, Amended Complaint at ¶ 89, but plaintiffs' own description of that never-issued forecast is that Freese–Notis was set to predict even higher temperatures for Thursday. Clearly, this would act to de-press, rather than stimulate the price of FCOJ contracts.

For whatever reason, there was a freeze scare for the orange belt during the December 11 to December 17, 1985 period, but nothing in plaintiffs' amended pleading or any of the affidavits offered in support of that pleading demonstrates that Freese–Notis was the cause of that scare. Indeed, plaintiffs' own pleading belies such contentions. Freese–Notis forecast a possible freeze only on a single occasion, namely in their December 16, 1985 forecast for Thursday, December 19, 1985. Yet plaintiffs maintain that the market became extremely volatile as early as December 11, 1985, such volatility lasting past the point when Freese–Notis had issued a forecast predicting mild Thursday temperatures for the orange belt.

Moreover, on December 17, 1985, the *Tampa Tribune* ran an article stating in effect that the freeze scare was over. Amended Complaint at ¶ 76. Surely Freese–Notis, a private weather forecasting firm, did not hold enough power in the FCOJ futures contract market to, on its own, create a scare worth reporting in a major metropolitan newspaper.[19]

In the case at bar, plaintiffs have failed to sufficiently demonstrate that Freese–Notis' conduct, such as it is, caused whatever monetary loss they suffered. Plaintiffs' failure to establish a plausible theory of causation is fatal to their complaint against Freese–Notis. *Ryder Energy Distribution Corp. v. Merrill Lynch Commodities, Inc.,* 865 F.2d 492, 492, 493 (2d Cir. 1989).

Plaintiffs contend that they are entitled to take discovery prior to the grant of summary judgment, under Rule 56(f).

Plaintiffs should be granted discovery to ascertain the basis for Freese–Notis' forecast and to probe *whether* such false

---

**18.** The plaintiffs do not contend that the named representatives of the putative class subscribe to Freese–Notis' weather service.

**19.** Plaintiffs themselves profess that one of the four major factors affecting the price of FCOJ futures contracts is weather predictions for the orange belt, *"especially U.S. government computer forecasts"*. Amended Complaint at ¶ 31. The amended complaint itself recognizes that it is the publicly available government data which is the real "mover and shaker" in the FCOJ futures contract market.

forecasts were part of the conspiracy to manipulate the FCOJ market. Plaintiffs' Memorandum of Law in Opposition to Defendants' Motions at 36–37 (emphasis added). Plaintiffs seek to use the discovery provision of Rule 56 to sanction a "fishing expedition"—to determine, in essence, *whether* Freese–Notis did anything wrong. This is not the purpose of the rule and I order no discovery prior to the grant of judgment in this case.

### Conclusion

Inasmuch as the first cause of action alleges that defendant Citrus Exchange "wilfully aided, abetted, counseled, induced, and procured" the commission of a violation of the Act, it is dismissed with prejudice pursuant to Rule 12(b)(6), without leave to replead, for failure to state a claim. The remainder of plaintiffs' first cause of action as to defendant Citrus Exchange is dismissed pursuant to Rule 12(b)(6), but with leave to replead.

The first cause of action is dismissed as to defendants Pusateri and Associates pursuant to Rule 12(b)(6), for failure to state a claim, but with leave to replead.

The first cause of action is dismissed as to defendant Futures Asset pursuant to Rule 9(b), for failure to plead fraud with particularity, or, in the alternative pursuant to Rule 12(b)(6), particularity, or, in the alternative pursuant to Rule 12(b)(6), for failure to state a claim, but with leave to replead.

The first cause of action is dismissed as to defendants "John Doe" and "Jane Doe" pursuant to Rule 12(b)(6), for failure to state a claim.

The second cause of action is dismissed without prejudice as to defendants Citrus Exchange, Pusateri, Associates, Futures Asset, "John Doe" and "Jane Doe" pursuant to Rule 12(b)(6), for failure to state a claim, but with leave to replead.

The amended complaint is dismissed in its entirety, and without prejudice, as to defendants Mallers and First American pursuant to Rule 12(b)(3) and 28 U.S.C. § 1406, on the grounds of improper venue.

Defendant Freese–Notis' motion for summary judgment is granted. As to defendant Freese–Notis, the amended complaint is dismissed in its entirety, with prejudice, and without leave to replead.

Plaintiffs may file a second amended complaint as to defendants Citrus Exchange, Pusateri, Associates, Futures Asset, "John Doe" and "Jane Doe" within forty-five (45) days of the date of this Opinion if so advised after counsel's consideration of the obligations imposed by Rule 11.

The foregoing is SO ORDERED.